IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ASHLEY RANDLE, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| PACIFICA COMPANIES, LLC d/b/a | § | CIVIL ACTION NO. _____ |
| MERIDIAN AT KESSLER PARK, | § | |
| | § | JURY TRIAL DEMANDED |
| Defendant. | § | |

**PLAINTIFF'S ORIGINAL COMPLAINT**

COMES NOW, Plaintiff Ashley Randle (hereafter referred to as "Plaintiff" or "Randle"), by counsel and brings this action for violations of the Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 *et seq.,* for gender and pregnancy discrimination and retaliation, the Pregnancy Discrimination Act ("PDA"),  42 U.S.C. § 2000ek, and the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.,* (the "ADA") complaining of Defendant Pacifica Companies, LLC d/b/a Meridian at Kessler Park (hereafter referred to as "Defendant" or "Pacifica") and respectfully shows the Court as follows:

**I.**

**PARTIES**

1.01.   Ashley Randle is an individual, who is a citizen and resident of the State of Texas, who may be contacted through her undersigned counsel of record.

1.02.   Defendant Pacifica Companies LLC. is a California Company with its principal place of business located at 1775 Hancock Street, Suite 200, San Diego CA 92110. It can be served with process through the Texas Secretary of State.

## II.

## JURISDICTION AND VENUE

2.01.   Jurisdiction is conferred on this Court by 28 U.S.C. § 1331.

2.02.   Venue for all causes of action stated herein lies in the Northern District of Texas because the Defendant resides in this District and because a substantial part of the events alleged in this Complaint took place within this District.  *See* 28 U.S.C. § 1391(b).  Plaintiff's EEOC charge was filed and pursued in the Dallas District office of the EEOC.  Plaintiff received her Notice of Right to Sue and has timely filed this lawsuit.

## III.

## FACTUAL ALLEGATIONS

3.01.   In or around February 2015, Ms. Randle began working for Pacifica Companies, LLC d/b/a Meridian at Kessler Park located in Dallas, Texas.  In September of 2015, she was promoted to Activities Director.

3.02.   As the Activities Director, Ms. Randle's job duties included planning and facilitating various activities for the residents of the senior living community. Ms. Randle's designated workspace was located on the third floor of the building. It was not an office; it was simply a room set up with a desk that did not have air conditioning or consistent internet access. She commonly worked from her makeshift office alone, with the majority of employees being located on the first floor throughout the workday. Due to limited internet access, Ms. Randle made several trips from the third floor each day in order to access internet needed to complete her tasks.

3.03.   Ms. Randle was sexually harassed in 2017 by Tim Neiswender. He texted her after work hours stating "Hey babe. Give me a call when you can. I hope you had a good day."

Neiswender would tell Ms. Randle to meet him in vacant apartments but she would tell him that she was involved in an activity. Neiswender told other managers that Ms. Randle should be demoted to server. Ms. Randle became so stressed out over Neiswender's behavior that she had to seek counseling. Ms. Randle reported Neiswender's behavior on March 13, 2018.

3.04. In Spring 2018, Ms. Randle informed her employers that she was pregnant. She then discovered that her pregnancy had complications and was considered high-risk due to her low blood pressure. Specifically, she notified her Executive Director, Terry Rawlinson ("Ms. Rawlinson") about her pregnancy along with the additional complications.

3.05. As a result of her low blood pressure. Ms. Randle was prone to experiencing fainting spells, which caused her to pass out and lose consciousness for a few moments. In order to ensure her safety, she requested an accommodation from Ms. Rawlinson of temporarily allowing her to work from the Marketing Office located in the lobby of the building. With such an accommodation, Ms. Randle would no longer have to travel up and down from the first to the third floor in order to access the internet connection. Additionally, she would no longer be isolated for a majority of the day in her third-floor makeshift office. From a common sense perspective, working alone when prone to fainting spells is an extreme health risk that is only exacerbated by pregnancy. Ms. Randle also asked for an accommodation that she would no longer be required to drive the Company van to transport residents because she felt it was dangerous to do so.

3.06. Ms. Randle's requests were denied. She was informed by Ms. Rawlinson that Regional Operations Manager, Jackie Bobbit ("Ms. Bobbit"), did not want Ms. Randle to work in the Marketing Office. No reason was provided as to why working in the Marketing Office would present an issue for her employer. Ms. Randle was forced to continue working from her makeshift

office, where internet was unreliable, and her email was often inaccessible. Further, Ms. Randle was also forced to continue driving the Company van to transport residents.

3.07. As a result of the Respondent's refusal to provide the requested accommodations, Ms. Randle was forced to continue working the duration of her high-risk pregnancy without appropriate accommodations putting not only her at great risk of fainting while alone in her makeshift office or while traveling from floor to floor to work, but also putting residents at risk.

3.08. Throughout the majority of her pregnancy Ms. Randle was also subjected to harassment on account of her pregnancy from her employer. Upon requesting accommodations, Ms. Randle was told by Ms. Rawlinson that pregnancy was "not an excuse," and "was no different than when she was sick." Ms. Randle was told that she should still be able to perform her tasks despite her high risk pregnancy and that accommodations were not necessary. Notably, Ms. Randle was not asking for a reduction in duties; she was simply asking for an accommodation that would allow her to work safely.

3.09. Not only were accommodations refused, but Ms. Randle was constantly given a hard time when she experienced difficulties at work related to her pregnancy. For example, she often wore a cross-body purse during her shift in order to cut down on her travelling time throughout the building and keep her cellphone with her at all times in case she was to experience a fainting spell or other emergency while alone. The purse did not affect her ability to perform her tasks. However, her employer complained about it and she was told she could no longer wear it. She was not provided any explanation as to why. Furthermore, Ms. Rawlinson texted Ms. Randle about Ms. Rawlinson's friend whose baby passed away which caused Ms. Randle additional stress.

3.10. On October 4, 2018, Ms. Randle passed out and lost consciousness while at work and was transported to the emergency room via ambulance. The incident was caused by a drop in

her blood pressure. From this point on, she had doctor's visits throughout the month to monitor her pregnancy.

3.11.    On October 16, 2018, Ms. Randle visited the hospital after experiencing contractions. She texted Ms. Rawlinson at 4:24am on October 16, 2018 from the hospital telling Ms. Rawlinson that she was in the hospital having contractions and in a lot of pain. At 8:47am that morning Ms. Rawlinson then asked what hospital Ms. Randle was in and later that day Ms. Randle sent her a doctor's note that Ms. Randle was placed on bed rest due to her pregnancy complications until October 24, 2018. Ms. Randle immediately provided appropriate notice to Ms. Rawlinson informing her of her hospital visit and resulting bed rest order via text message. Shortly thereafter, she gave birth on October 20, 2018, and immediately began her medical leave.

3.12.    When Ms. Randle returned to work, she learned that Ms. Rawlinson and Ms. Bobbit wrote Ms. Randle up and put her on a PIP on October 16, 2018 while Ms. Randle was in the hospital.

3.13.    During her medical leave, Ms. Randle was contacted by Ms. Rawlinson regarding various workplace obligations. Ms. Rawlinson sent several text messages and phone calls to Ms. Randle regarding community newsletter articles, resident activity bookings, and scheduling inquiries. The earliest request was sent via text message on October 23, 2018 – a mere three days after Ms. Randle's delivery. Ms. Randle promptly responded to each of Ms. Rawlinson's requests even though she was on leave.

3.14.    On January 15, 2019, Ms. Randle returned to work. She was immediately presented with a Performance Improvement Plan (PIP) the following day by Ms. Rawlinson and Ms. Bobbit.

3.15.    Within the PIP, her employers discussed several issues regarding Ms. Randle's employment which were previously never brought to her attention. The PIP discussed her

performance over the past month, stating "it has become increasingly evident to your Team members and me that you have not been performing your assigned work in accordance with what is expected of an Activities Director. To date there has not been any significant improvement."

3.16.   Noticeably, nearly all of the performance issues discussed within the PIP occurred at the height of Ms. Randle's high-risk pregnancy. Although she requested accommodations that would have allowed her to more effectively complete her job duties due to her pregnancy, she was denied. Instead, Ms. Randle faced a series of issues that hindered her ability to effectively perform her duties. For example, lack of consistent internet and email access necessary for her to complete essential job duties. Additionally, the PIP addressed Ms. Randle's presence in the Marketing Office as an "Area of Concern," which was in direct correlation with her pregnancy as she had previously expressed a need to relocate her workspace to a more accessible area of the building.

3.17.   Curiously, Respondent states that Ms. Randle's performance was "just above average" according to a January 2016 review, as if that is somehow a poor performance. As Respondent's own Exhibit C clearly identifies, the ratings run on a 1 to 5 system with 5 being the highest. An "above average" performance review is a 4. Further, Respondent then makes the unsupported claim that Ms. Randle was uncooperative, rude, and overbearing despite the fact that her performance review clearly states otherwise. Indeed, Ms. Randle received a "4" for attitude. Further, the fact that Ms. Randle received a verbal counseling with respect to being unable to go to work as a result of her car being towed is completely unrelated to the PIP and should be disregarded.

3.18.   Accordingly, prior to being placed on the PIP, she never received any verbal or written warnings about her job performance as the Activities Director, or about her workplace

conduct with patients and staff. In fact, in September 2018 Ms. Randle had just received a $3.00 pay increase due to her good performance.

3.19. At the end of the 30-day period prescribed by the PIP, Ms. Randle was not provided with any feedback or further direction regarding her improved performance. Additionally, her employment was not terminated. Ms. Randle was never approached by Management or given any further evaluation and took that as a sign that she reached the goals set forth in the PIP. To the contrary, Ms. Randle was working incredibly hard. She even went into the office on the weekends when necessary to arrange activities and special events for the residents. Indeed, she was actually complimented on her performance and teamwork by Ms. Rawlinson via text in February 2019 after she set up a party for the Super Bowl. Ms. Rawlinson continued to compliment Ms. Randle's performance as late as March 18, 2019.

3.20. On March 26, 2019, Ms. Randle was abruptly terminated from Meridian.

## IV.

### FIRST COUNT

### **GENDER AND PREGNANCY DISCRIMINATION AND RETALIATION**

4.01. The foregoing paragraphs of this Complaint are incorporated in this Count as fully as if set forth at length herein.

4.02. Plaintiff was an employee within the meaning of Title VII and belongs to a class protected under the statute, namely she is female. 42 U.S.C. §2000e(f).

4.03. Defendant is an employer within the meaning of Title VII. 42 U.S.C. §2000e(b). In particular, Defendant employs more than fifteen (15) employees within the current calendar year.

4.04. Defendant intentionally discriminated against Plaintiff because of her gender in violation of Title VII by discriminating against her on the basis of pregnancy, childbirth, or related medical conditions. 42 U.S.C. §2000e(k).

4.05. Plaintiff was terminated without good reason. Furthermore, Defendant was aware that Plaintiff was pregnant and needed accommodations. Defendant denied Plaintiff's request for accommodations and placed her at risk.

4.06. All conditions precedent to filing this action for discrimination under federal law have been met. Plaintiff timely filed her charge of discrimination and has received her Notice of Right to Sue within 90 days of filing this original action. (*See* Exhibit A).

4.07. Defendant violated Title VII by discharging Plaintiff and/or discriminating against Plaintiff with compensation, terms, conditions or privileges of employment because of Plaintiff's sex. Defendant retaliated against Plaintiff by firing her after she complained of sex harassment and failure to accommodate.

4.08. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered significant financial loss, including the loss of her job and the loss of wages, salary and employment benefits.

4.09. Such discrimination by Defendant against Plaintiff was intentional. Accordingly, Plaintiff is entitled to recover damages from Defendant for back pay, front pay, past and future pecuniary losses, emotional pain and suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses. Further, this discrimination was done with malice or with reckless indifference to Plaintiff's federally-protected rights. Plaintiff is therefore entitled to recover punitive damages.

4.10. Plaintiff is entitled to an award of attorneys' fees and costs under Title VII as well as reimbursement of expert witness fees.

V.

## SECOND COUNT

## AMERICANS WITH DISABILITIES ACT OF 1990

5.01. Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs and incorporates the same as if set forth at length herein.

5.02. Plaintiff has filed a charge of disability discrimination with the EEOC. Plaintiff files this Complaint within 90 days of her receipt of the Notice of Right to Sue from the EEOC.

5.03. Defendant was an "employer" under the ADA, 42 U.S.C. § 12111(5)(A).

5.04. While employed by Defendant, Plaintiff suffered from a disability under the statutory definition provided in the ADA, 42 U.S.C. § 12102(2), because Plaintiff had a physical impairment that substantially limited one or more of her major life activities, a record of impairment, and/or was regarded as having such an impairment by Defendant. Plaintiff had a record of impairment because she took time off from work for treatment of her diagnosed health condition. Plaintiff was regarded as having a disability when she disclosed to her employer her medical diagnoses.

5.05. While employed by Defendant, Plaintiff was a "qualified individual with a disability" under the ADA, 42 U.S.C. § 12111(8). Plaintiff was and is a qualified individual for the job in question. With reasonable accommodation and schedule adjustments, Plaintiff could have performed, and can perform, the essential functions of her job.

5.06. Defendant terminated Plaintiff because of her disability.

5.07.   Defendant treated Plaintiff less favorably than its non-disabled employees.

5.08.   Defendant violated the ADA, 42 U.S.C. § 12112, by terminating Plaintiff and/or discriminating against her in connection with her advancement, compensation, job training, and other terms, conditions, and privileges of her employment because of Plaintiff's disability.

5.09.   Such discrimination by Defendant against Plaintiff was intentional. Accordingly, Plaintiff is entitled to recover damages from Defendant for back pay, front pay, past and future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses. Further, this discrimination was done with malice or with reckless indifference to Plaintiff's federally protected rights.  Plaintiff is therefore also entitled to recover punitive damages.

5.10.   Plaintiff is entitled to an award of attorneys' fees, expert fees, and costs under the ADA.

## VI.

## **JURY DEMAND**

6.01.   PLAINTIFF DEMANDS A TRIAL BY JURY.

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff prays that Defendant be cited to appear and answer herein, and that on final trial, Plaintiff have and recover the following relief against Defendant:

1. Judgment for back pay and front pay and all past and future lost fringe benefits;

2. Judgment for actual damages in the amount of past and future lost earnings and benefits, and damages to past and future earnings capacity;

3. Compensatory damages for the humiliation, damage to reputation, mental and emotional distress, and pain and suffering Plaintiff has experienced and endured as a result of the discriminatory actions of Defendant;

4. The costs and expenses incurred by Plaintiff in seeking new employment;

5. Damages for past and future mental anguish and emotional distress and damages to reputation;

6. Liquidated damages to the fullest extent allowed by law;

7. Economic and reliance damages,

8. Prejudgment and postjudgment interest at the maximum legal rate;

9. Attorneys' fees;

10. Expert's fees;

11. All costs of court; and

12. Such other and further relief to which Plaintiff may be justly entitled.

Dated: this 5th day of March, 2021.

                                              Respectfully submitted,

                                              **KILGORE & KILGORE, PLLC**

                                              By: /s/ Theodore C. Anderson
                                              Theodore C. Anderson

        State Bar No. 01215700
        tca@kilgorelaw.com
        D. Elizabeth Masterson
        State Bar No. 00791200
        dem@kilgorelaw.com
        3109 Carlisle
        Dallas, Texas 75204
        (214) 969-9099- Telephone
        (214) 953-0133 – Facsimile
       **ATTORNEYS FOR PLAINTIFF**